## THE DAUNTLESS.

### (District Court, D. Maryland. May 15, 1908.)

COLLISION—STEAM AND SAILING VESSELS.

Evidence considered, and *held* to establish the fault of a tug for a collision with a schooner at night; it appearing therefrom that the schooner carried proper lights, and that she kept her course, which placed the duty on the tug to keep out of her way, and that the pilot in charge did not give proper attention to the schooner.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 55.]

In Admiralty. Suit for collision.

Robert H. Smith, for libelants.

Foster & Foster, for respondents.

MORRIS, District Judge (orally). Undoubtedly the libelant has the burden of establishing, by a reasonably satisfactory preponderance of proof, the negligence of the tug. On the other hand, the steam vessel is, by the rules of navigation, to keep out of the way of the sailing vessel, and she has that burden to sustain, and to exculpate her it must appear that she has done all that was reasonably possible to keep out of the way of the sailing vessel.

In a case of this kind much attention must be given to the probabilities of the case, looking to the facts which are established, and it appears to me that, even if the testimony of the two witnesses from the schooner is entirely disregarded, the case sought to be made in her behalf is much the more probable. If their testimony is true, then the schooner did all that was required of her. If it is not true, then those two witnesses, the mate and the man at the wheel, have combined together to give perjured testimony. Johnson, the mate of the schooner, was a man 68 years of age, a navigator of experience, and his testimony as read to me impressed me favorably. He does not claim to have seen more than it would have been natural for him to have seen under the circumstances. And the man at the wheel seemed to be careful and candid in his statements. He says he did not see the tug at all, but told of the directions he had from the mate as to keeping his course in the presence of the tug, and he seems to have spoken truthfully when he says that the mate constantly observed the tug and walked backward and forward and gave him his orders. Now, in such a case, any change in the course of the schooner must be made by the man at the wheel by orders from the mate. He could not see for himself whether there was any danger or not, and therefore it

is not to be supposed that he, in a fright, lost his head and made a change of course. Whatever change he made was by the express direction from the mate who was watching the tug approach, and therefore it is readily to be believed that the mate's orders were given in consequence of what he observed.

Now, as to the lights: It seems to me that the preponderance of evidence is that the schooner displayed the proper lights. As to the testimony from the tug, it all rests very much upon the pilot. I do not think that his testimony shows that he was much impressed with the necessity of his keeping out of the way of the schooner. He speaks of having given warning, calling the attention of the schooner, as if she were another steam vessel that was obliged to maneuver on her own behalf in order to keep out of the tug's way. He says that he changed his course a half a point, and notwithstanding that, as he says, the schooner seemed to hang on to his starboard bow, he does not seem to have made any sufficient effort to keep out of the way. The way she seemed to him to luff, and the fact that she still seemed to hang on to his starboard bow and be coming toward him, was sufficient to impose upon him every possible exertion to avoid a collision; but I cannot see from his testimony that he was very much impressed by that duty. He speaks of having changed his course a half a point, and to have stuck to that for some time, and he struck me as being very slow in making a decided change in order to clear the schooner. Now, when you come to his account of how the collision happened— that is to say, that the schooner, having come along to within about 50 yards, and being in a position nearly abreast of the tug and where she should have gone clear, and then, as he says, without any reason that any one can see, that she made such a decided change in her course as to go off to the westward so as to run in the starboard bow of the tug—it all seems in the highest degree impossible. There was no reason for doing it unless those on the schooner were frightened and lost their heads, and there is no reason to suppose that that was the case. It seems to me in the highest degree improbable that the schooner made such an absurd and unjustifiable change in her course as would have been necessary to bring about a collision in the way those on the tug have stated it.

Now, as to the way the vessels came together: It appears to me that that is just as consistent with one theory as with the other. It seems to me that there is quite sufficient evidence all the way along of a want of caution on the part of the tug, and that, if the tug had been as careful as she should have been—even taking the pilot's own account of what happened—the tug would have been more active and would have taken more energetic measures to have avoided the risk of collision which was apparent and which the pilot himself says he could see. I think he had an opportunity to do a great deal more than he did do, according to his own account. It seems to me it is one of those cases of which there are many, in which the dilatoriness of the steam vessel allows a sailing vessel to get so close to her that the collision is inevitable before she makes a change in her course. I think that the proof sustains the allegations of the libel and that the libelant must succeed.

There appears to be some difficulty as to the value of the schooner. She was an old vessel, built in 1865. That is a matter that will have to go to a master, unless you can agree upon her value.